**IN THE COURT OF APPEALS OF IOWA**
No. 16-1067
Filed November 8, 2017

**STATE OF IOWA,**
     Plaintiff-Appellee,

**vs.**

**RODOLFO GONZALEZ PENA,**
     Defendant-Appellant.
_____

Appeal from the Iowa District Court for Black Hawk County, Kellyann M. Lekar, Judge.

Rodolfo Gonzalez Pena appeals from his convictions for first-degree murder and carrying weapons. **AFFIRMED.**

Mark C. Smith, State Appellate Defender, and Bradley M. Bender, Assistant Appellate Defender, for appellant.

Rodolfo Gonzalez Pena, Fort Madison, appellant pro se.

Thomas J. Miller, Attorney General, and Kevin Cmelik and Linda J. Hines, Assistant Attorneys General, for appellee.

Heard by Danilson, C.J., and Doyle and Mullins, JJ.

**DANILSON, Chief Judge.**

Rodolfo Gonzalez Pena (Gonzalez) appeals from his convictions for first-degree murder and carrying weapons. Gonzalez asserts the facts do not support a felony-murder conviction, the court erred in summarily denying his motion for new trial and instructing the jury on felony murder, and trial counsel was ineffective in not requesting that the jury determine if Gonzalez committed one or more criminal acts. Because we find the two shots fired were sufficiently independent of each other to support a conviction of felony murder, trial counsel was not required to seek an additional jury instruction, the court did not err in denying Gonzalez's motion for new trial, and there is substantial evidence to support a finding of malice aforethought, we affirm the convictions.

**I. Background Facts & Proceedings.**

At approximately 11:00 p.m. on August 22, 2014, Meighan Middleton was in a Waterloo bar with her fiancé, Celio Posada. Also in the bar were Jose Ruben Villalpando, the owner who was bartending that night, and Ruben's sons, George and Ivan Villalpando. Middleton and Posada sat at the bar for approximately twenty-five minutes before Gonzalez entered and took a seat near them at the bar. Although Middleton and Posada did not know Gonzalez, the three engaged in casual conversation. The men bought each other shots of tequila, and Gonzalez purchased a bottle of Buchanan's, which was placed in an ice bucket on the bar near the three customers.

Around 12:00 a.m., Gonzalez exited the building leaving the bottle on the bar. Posada followed him carrying the bottle of Buchanan's. A brief time later, Middleton picked up Posada's wallet and cell phone from the bar and followed

the men out into the parking lot. She saw Gonzalez and Posada talking, approached Posada, and asked him if he and she were leaving. Posada told her no. Middleton then went back inside to use the restroom.

When Middleton left the restroom, George Villalpando was running towards her yelling, "He's been shot. He shot your husband." Middleton ran outside and saw Posada "on the ground, up against" her Jeep. There was blood on the right side of Posada's head. Middleton ran to Posada and held his arm and neck as he took his last breaths.

At approximately 12:20 a.m. on August 23, Deputy Sheriff Matthew Harris, was on his regular patrol and driving westbound when he observed a silver truck driving with no headlights. Deputy Harris stopped the truck, and Gonzalez was the truck's driver. Deputy Harris discovered that Gonzalez's license was suspended and placed him under arrest. Deputy Harris performed an inventory of Gonzalez's truck—he found a pistol between the driver's and passenger's seats. Deputy Harris also arrested Gonzalez for carrying weapons and transported him to the county jail.

Sometime later, Ruben, George, and Ivan Villalpando and Middleton went to the police station to give statements. Each was shown a photo array, and each selected Gonzalez's photo as the person who had been in the parking lot.

Two bullet cartridges were found in the bar parking lot. One cartridge was located six feet from Posada. Another cartridge was located approximately thirty-five feet from Posada's body. An open knife was found near Posada's body. There was a trail of Posada's blood between the location of the furthest cartridge and Posada's body. A bullet was found in Posada's left arm. Testing revealed

that both this bullet and the cartridges found in the parking lot were fired from the gun seized from Gonzalez's vehicle.

During an interview with Detective Brice Lippert, Gonzalez did not initially admit any involvement in the shooting at the bar. Gonzalez explained he was at the bar with a friend, Roberto. Gonzalez denied being in the parking lot at the same time as Posada. He then stated that Posada grabbed him by the shirt when they were in the parking lot. When asked whether Posada had any weapons on him, Gonzalez was uncertain. He later mentioned being poked by a knife; however, when questioned about whether he saw a knife, Gonzalez stated he did not see one. Eventually, Gonzalez asserted that it was Roberto, his twin brother, who had shot Posada.[1] Gonzalez was charged with first-degree murder and carrying weapons.

An autopsy revealed that Posada had been shot in the chest and in the head; both shots would have been fatal. The medical examiner, Dr. Dennis Klein, concluded the first shot was to Posada's chest and came from a distance. Dr. Klein testified that Posada could have been mobile after being shot in the chest but not after being shot in the head. Further, Dr. Klein stated Posada was in a seated position when he was shot in the head and this shot was from close range.

Michael Halverson, a blood-stain-pattern analyst with the Iowa Department of Criminal Investigations, also concluded Posada was in a seated position by Middleton's Jeep when he was shot in the head. Victor Murillo, the

---

[1] There was no evidence a "Roberto" was present or that Gonzalez has a twin.

State's firearm's expert concurred with Dr. Klein's conclusion Posada was shot in the chest from a distance and in the head from a close range.

At trial, Gonzalez testified that when he exited the bar, Posada walked outside with him. Gonzalez stated that as he walked toward his parked truck, he waved his hand and told Posada, "See you later." Posada then grabbed Gonzalez by the shirt in the corner of the parking lot and tried to stab him with a knife. Gonzalez testified Posada said, "MS-13 and I kill people."[2] Gonzalez stated he hit Posada's hand and Posada dropped the knife. Gonzalez then ran away and heard Posada say to him, "I'm going to kill you." Gonzalez testified he was carrying a gun, and as he tried to get to a lighted area of the parking lot he fired the first shot; he did not know whether it struck Posada. He testified Posada came in front of him and he fired the second shot. Gonzalez then got in his truck and drove away.

During the discussion regarding the jury instructions, Gonzalez objected to the inclusion of the felony-murder alternative of the first-degree murder instruction. Specifically, Gonzalez argued:

> We're objecting to the inclusion of the felony murder instruction which essentially is 4B and anything that's applicable to it following that marshalling instruction. I understand the State's argument will be that they have two separate acts because there is the first gunshot and the second gunshot. Presumably, the argument is that the first gunshot was an attempted murder or willful injury being the predicate felony for—forcible felony, excuse me, for the second gunshot which led to the death of Mr. Posada.
> The first argument is that these are not different acts or sufficiently different acts to warrant parsing them out. . . .
> And that—where that ties into, Your Honor, is it goes back to the—the *Velez* case, as well as the *Ross* case where we're kind of looking at—in those cases, they're looking at units of prosecutions,

---

[2] Testimony at trial indicated MS-13 is the name of a gang.

but you start with the idea that you can say these are separate acts and then ultimately convict somebody of separate acts.

The court denied Gonzalez's request and included the felony-murder alternative in the instruction.

Thus, with respect to the charge of first-degree murder, the jury was instructed that to prove Gonzalez guilty the State was required to prove all of the following elements beyond a reasonable doubt:

> 1. On or about the 23rd day of August, 2014, the defendant shot Celio Posada.
> 2. Celio Posada died as a result of being shot by the Defendant.
> 3. The defendant acted with malice aforethought.
> 4(a). The defendant acted willfully, deliberately, premeditatedly and specific intent to kill Celio Posada, or
> 4(b). The defendant was participating in the offense of attempted murder or willful injury causing serious injury, as defined in [other instructions].

Concerning element 3, the jury was instructed malice aforethought "may, but is not required to, be inferred from the defendant's use of a dangerous weapon." A firearm is a dangerous weapon.

The jury was also instructed on Gonzalez's claim of justification. The justification instruction stated:

> A person is justified in using reasonable force if he reasonably believes the force is necessary to defend himself from any imminent use of unlawful force.
> If the State has proved any one of the following elements, the defendant was not justified:
> 1. The defendant started or continued the incident which resulted in injury and death.
> 2. An alternative course of action was available to the defendant.
> 3. The defendant did not believe he was in imminent danger of death or injury and the use of force was not necessary to save him.

4. The defendant did not have reasonable grounds for the belief.

5. The force used by the defendant was unreasonable.

Additional instructions provided guidance on items three through five of the justification instruction.

The jury found Gonzalez guilty of first-degree murder. Special interrogatories were submitted along with the verdict form asking if the jury unanimously found the defendant guilty of premeditated murder or felony murder. In answering the special interrogatories, the jury unanimously found Gonzalez not guilty of premeditated murder but unanimously found him guilty of felony murder.

Gonzalez filed a motion for new trial, urging the gunshots were not different acts and the verdict was contrary to the weight of the evidence.[3] The district court denied the new trial motion. The court's written order states:

> The motion for new trial filed by the defendant raises two issues in support of the motion. The first issue is that the court erred in submitting the felony murder alternative to the jury as the two gunshots involved in this matter were not qualitatively different acts. The second issue is that the verdict is contrary to the weight of the evidence.
> The court will first address the second issue raised by the defendant. The court addressed motions made at the appropriate times of the trial by the defendant seeking a directed verdict or judgment of acquittal and the record will stand for itself with regard to the rulings on those motions for directed verdict and the evidence which supported the submission of this matter to the jury for determination. The court denies the motion for new trial on the basis that the verdict is contrary to the weight of the evidence. The

---

[3] In a second motion for new trial, Gonzalez argued there was newly-discovered evidence. However, this motion was withdrawn.

After the appointment of a new attorney, a third motion for new trial was filed. Gonzalez argued he was denied a fair trial because he was not provided an interpreter and trial counsel was ineffective for failing to request an interpreter and for waiving an opening statement. After a hearing, the district court denied this motion.

court finds . . . , upon the entire record, the verdict rendered by the jury is not contrary to the weight of the evidence, and that, indeed, the weight of the evidence can be found to support the verdict rendered by the jury.

As previously noted, the defendant also alleges that the court erred in submitting the felony murder alternative instruction to the jury based on the argument that the two gunshots were not qualitatively different acts. As indicated, the record will speak for itself, but the court notes that the evidence in this matter established that there were two separate gunshots fired in this matter, that the defendant admitted that he shot the gun twice, that there is a distance of approximately [thirty] to [forty-five] feet which is evidenced by a blood trail and other evidence between the location where the first shot was fired to the location where the second, fatal shot was fired and the result of the distance between the shots means that the defendant would have had to follow or travel with the victim from the place of the first shot to the place of the second shot. The evidence offered in the case also established that the first shot either would have been or would likely have been fatal if the second shot had not occurred prior to the first shot causing death. The second shot resulted in nearly instantaneous death to the victim. Both parties relied on *State of Iowa v. Heemstra*, 721 N.W.2d 549 (Iowa 2006), and *State of Iowa v. Tribble*, 790 N.W.2d 121 (Iowa 2010), in support of their positions in this matter. The defendant further cites *State of Iowa v. Pullman*, [No. 09-1897, 2011 WL 441396 (Iowa Ct. App. Feb. 9, 2011)], and *State of Iowa v. Millbrook*, 788 N.W.2d 648 (Iowa 2010).

A significant record was made at the time of trial and, specifically, at the time of the record on jury instructions, concerning the submission of the felony murder alternative to the jury and the different or separate acts argument concerning the two gunshots in this case. The court stands on that record and the rulings made at the time of trial. In addition, the court has reviewed the cases cited by the parties at the time of the hearing on post-trial motions.

Following a review, this court finds that the instruction at issue accurately states the law and is supported by substantial evidence. The case law establishes that the rationale of the felony murder rule is that certain crimes are so inherently dangerous that proof of participating in these crimes may obviate the need for showing all of the elements normally required for first degree murder. In the present case, the predicate crime or underlying felony that supports the submission of the felony murder instruction is that of attempted murder. The defendant fired two shots at the victim. There was substantial evidence submitted to the jury that the first shot fired by the Defendant at the torso of the victim was an attempt to murder or bring about the death of the victim. The court

finds that the act of the first shot was not the same act that caused the death of the victim in the present case, and therefore, the first shot need not be merged into the second shot as directed in *Heemstra* . . . . *Heemstra* establishes that if a defendant assaults a victim twice, first without killing him, and second with fatal results, the former could be considered as a predicate felony, but the second could not because it would be merged with the charge of murder.

In the present case, the testimony received by the court was that the first shot to the victim would have been or most likely would have been fatal. However, the events of that gunshot resulting in the victim's death were never allowed to play out due to the actions of the defendant in subsequently, and in a separate act, delivering a second shot execution style to the victim's head which resulted in the almost immediate death of the victim. This court does not put any weight on the fact that the first shot might have been fatal to the victim as somehow making the charge of attempted murder inaccurate in association with the first shot, nor does it merge the first shot into the second shot so long as the two shots were qualitatively different acts.

Gonzalez appeals, contending the district court should not have instructed the jury on felony murder, the court erred in summarily rejecting his motion for new trial based on the claim that the verdict was against the weight of the evidence, and there is insufficient evidence to sustain the felony-murder conviction.

## II. Scope and Standards of Review.

"Iowa law requires a court to give a requested jury instruction if it correctly states the applicable law and is not embodied in other instructions." *State v. Plain*, 898 N.W.2d 801, 816 (Iowa 2017) (quoting *Sonnek v. Warren*, 522 N.W.2d 45, 47 (Iowa 1994)). "The verb 'require' is mandatory and leaves no room for trial court discretion." *Alcala v. Marriott Int'l, Inc.*, 880 N.W.2d 699, 707 (Iowa 2016). "[W]e generally review a district court's refusal to give a requested jury

instruction for errors at law; however, if the jury instruction is not required but discretionary, we review for an abuse of discretion." *Plain*, 898 N.W.2d at 811.

"We review a challenge to the sufficiency of evidence for correction of errors at law." *State v. Howse*, 875 N.W.2d 684, 688 (Iowa 2016).

> We "consider all of the record evidence viewed in the light most favorable to the State, including all reasonable inferences that may be fairly drawn from the evidence. We will uphold a verdict if substantial record evidence supports it." [*State v. Showens*, 845 N.W.2d 436,] 439-40 [(Iowa 2014)] (quoting [*State v.*] *Romer*, 832 N.W.2d [169], 174 [(Iowa 2013)]). Evidence is substantial when "a rational trier of fact could conceivably find the defendant guilty beyond a reasonable doubt." *State v. Thomas*, 561 N.W.2d 37, 39 (Iowa 1997). If evidence only raises "suspicion, speculation, or conjecture," it is not substantial evidence. *Id.* (quoting *State v. Randle*, 555 N.W.2d 666, 671 (Iowa 1996)).

*Id.*

With regard to the standard applied when evaluating motions for new trial, the district court must determine whether a greater amount of credible evidence supports one side of an issue more than the other. *State v. Ellis*, 578 N.W.2d 655, 658 (Iowa 1998). Included in this determination is an assessment of the credibility of witnesses. *Id.* However, the motion should only be granted for cases in which the evidence weighs heavily against the verdict, so as not to diminish the jury's role as the principal fact-finder. *Id.* at 659.

**III. Analysis.**

***A. Felony-murder instruction.*** Gonzalez asserts the first-degree murder marshaling instruction was legally flawed in two respects. First, under principles stated in *Heemstra*, 721 N.W.2d at 558, the willful injury or the attempted murder against Posada should not have been submitted as a predicate felony for felony murder because the facts do not support a finding Gonzalez committed separate

acts for purposes of felony murder. And second, the jury should have been required to make the determination whether Gonzalez committed one act of shooting or multiple acts of shooting, and trial counsel was ineffective in failing to request an instruction requiring the jury make those findings. Neither argument is convincing here.

*1. Independent acts support the felony-murder instruction.* In *Heemstra*, our supreme court held willful injury cannot serve as a predicate felony under the felony-murder statute when "the act causing willful injury is the same act that causes the victim's death." 721 N.W.2d at 558. Instead, the act intended to cause serious injury used to support the predicate willful-injury offense must be separate from the act that kills the other person while the person participates in the predicate willful-injury crime. *Id.* If the act or acts intended to cause serious injury were the same act or acts that caused death, the act or acts merge into the murder and cannot serve as a predicate felony. *Id.*

Gonzalez attempts to characterize the facts here as "shots fired in succession" and thus not independently actionable. In *State v. Ross*, 845 N.W.2d 692, 702 (Iowa 2014), our supreme court addressed the question of whether substantial evidence supported the jury's verdict that Ross's actions constituted five counts of intimidation with a dangerous weapon with intent where Ross fired a weapon into a group of five people. The court explained the factors available to "aid the fact finder in determining if the defendant's assaultive conduct is one continuous act or a series of separate and distinct acts. *Ross*, 845 N.W.2d at 705.

These factors are (1) the time interval occurring between the successive actions of the defendant, (2) the place of the actions, (3) the identity of the victims, (4) the existence of an intervening act, (5) the similarity of defendant's actions, and (6) defendant's intent at the time of his actions.

*Id.* In applying the factors, the court concluded there was sufficient evidence for finding "only two separate and distinct acts." *Id.* The court noted the record indicated a shot or shots fired, a pause, and then another round of shots fired. *Id.* The court also observed one victim crossed the street after the first serious of shots, which "was an intervening act causing Ross to start firing his gun again." *Id.* at 706.

In the case before us, the evidence presented was that Posada was shot in the chest from a range of four to eight feet. This wound might have proved to be fatal. Yet, Posada traveled some thirty to forty-five feet, leaving a blood trail as he went. Posada was then shot from close range in the head. Posada was near the ground at the time, and the bullet entered his right temple, traveled down through his brain, neck, and left arm, lodging in his left triceps. This injury was almost immediately fatal. We can infer from the evidence that Gonzalez also traveled between shots. Although Posada was the victim of both shots and the time interval was minimal, there was some intervening time, as well as a change in locations by both Posada and Gonzalez to the other side of the parked vehicle. As in *Ross*, we find the record supports two separate and distinct acts.[4]

---

[4] Gonzalez relies in part on *Williams v. State*, 90 So. 3d 931, 935 (Fla. Dist. Ct. App. 2012), a case cited in *Ross*, 845 N.W.2d at 704. The *Ross* court noted the Florida court in *Williams* determined shots fired in succession constituted a single crime, and observed:

there was no intervening act between gunshots, the location of the shooting was the same, and the evidence did not show the defendant formed a new intent with each shot.

In *Heemstra*, the supreme court stated a felonious assault of willful injury could serve as the predicate offense for felony murder if, for instance, "the defendant assaulted the victim twice, first without killing him and second with fatal results." 721 N.W.2d at 557. The facts before us fit within that description—Gonzalez shot Posada twice, first without killing him and second with fatal results.

> The supreme court restated its *Heemstra* holding,
>
> [W]here the act causing willful injury is the same act that caused the victim's death, the former merges with the murder and cannot serve as a predicate felony for felony-murder purposes. This is not to say, however, that willful injury could *never* serve as the predicate felony for felony-murder purposes. We narrowed *Heemstra's* scope by noting, for example, that where "a defendant assaulted the victim twice, first without killing him and second with fatal results," only the second act would be merged with the murder and that the first act could be considered as a predicate felony. Thus, the merger rule announced in *Heemstra* applied only in cases involving a single felonious assault on the victim which results in the victim's death.

*Goosman v. State*, 764 N.W.2d 539, 542 (Iowa 2009) (internal citations omitted).

In *Tribble*, the court again considered a felony-murder conviction based on the felonious assault of willful injury. 790 N.W.2d at 123-24. The court upheld the conviction there because substantial evidence supported a jury finding that head trauma and asphyxia were caused by separate acts, either of which could have been the factual cause of the victim's death. *Id.* at 129. The *Tribble* court explained:

> Our law recognizes two separate acts can join to cause death, but the result does not alter criminal responsibility for an act. Causation only implicates the merger doctrine when the act supporting the commission of the predicate felony is a factual

---

*Ross*, 845 N.W.2d at 704. However, our facts are distinguishable.

cause of death and the second act is not. If the act giving rise to the underlying forcible felony is the sole factual cause of death, then any subsequent separate act of violence not also a factual cause of death plays no role in the felony-murder analysis.

Accordingly, the law governing multiple factual causation is consistent with the purposes of the felony-murder doctrine and the merger doctrine. Merger seeks to prevent a felonious act alone from becoming first-degree murder and leaves the felony-murder doctrine available to elevate an independent homicidal act into first-degree murder without proof of the usual required *mens rea* for the purpose of deterring certain felonious conduct. As long as an independent act is a factual cause of death, the doctrines work to achieve their desired purposes.

In this case, substantial evidence supported a finding that an act of strangulation, choking, or drowning was a factual cause of Tracy's death by asphyxia. Substantial evidence also supported a finding of the commission of the forcible felony of willful injury causing serious injury based on a separate earlier act of blunt-force trauma to Tracy's head. The facts further supported a finding that the head trauma and asphyxia were inflicted by separate acts, with the head trauma occurring first followed by a separate act resulting in the asphyxia. Thus, separate, independent acts were identified by the evidence. Moreover, the evidence showed the act causing asphyxia was a factual cause of death. In fact, Tribble does not contest this evidence. Consequently, it is not important under the felony-murder analysis whether or not the separate earlier acts of blunt-force trauma were also a factual cause of death. If the acts of blunt-force trauma were also a factual cause of death, felony murder applies in this case because a separate act of asphyxia was also a factual cause. If the acts of blunt-force trauma were not a factual cause of death, felony murder likewise applies because the blunt-force trauma would satisfy the willful-injury elements of acts intended to cause serious injury and causing serious injury, followed by a separate act causing death by asphyxia.

*Id.*

Gonzalez contends the facts of this case are more akin to *State v. Pullman*,[5] where this court concluded "the three separate shots were not

---

[5] We explained the
district court, relying on the evidence Eddings had been shot three times, determined each shot was a separate assault. Therefore, one or two shots could form the basis for a willful injury conviction or assault resulting in serious injury conviction and the other shot the basis for a felony-

'sufficiently independent' of each other to support a conviction of felony murder, . . . and do not 'separately support' both an underlying forcible felony and acts resulting in the killing." 2011 WL 441396, at *6 (citation omitted). In the present case, however, the two shots *were* sufficiently independent of each other. As noted by the trial court,

> [Gonzalez] first shot the victim in the torso. The evidence from testimony and at the scene establishes that the victim traveled approximately [thirty] to [forty-five] feet from the place of the first shot to the place of the second shot and that the victim was either slumped to the ground or in the process of slumping to the ground at or about the time of the second shot. Time would have elapsed during which the victim, having already been shot in the torso with a potentially-fatal shot, traveled the distance between the two shots and to slump into the position where the second shot was delivered at relatively close range to his head. [Gonzalez] had the time to take the first shot, follow or track the victim to the site of the second shot, and to take the second shot. There was a break in the shooting. There was a break in the position of the parties. There was a break in the dynamics between the parties because the victim had already been shot and injured.

*2. Counsel was not ineffective in failing to request that the jury make a finding on the issue of whether there were independent acts.* Gonzalez next contends his trial counsel was constitutionally deficient in failing to request that the jury make a finding on "whether Gonzalez committed on[e] act of shooting or multiple acts of shooting." *See State v. Love*, 858 N.W.2d 721, 727 (Iowa 2015) (Mansfield, J., specially concurring) ("And if the court was uncertain whether more than one potential criminal act was involved, it could ask the jury to make a

---

murder conviction. [Pullman] argues there was only one assault—that the shots all were fired in a single burst with no pause. He further argues the medical examiner testified Eddings died of multiple gunshot wounds and could not identify any single shot as the cause of death.
2011 WL 441396, at *3.

finding on this issue, based upon the legislature's definition of the offense and using the standards we have discussed in [*State v. Velez*, 829 N.W.2d 572, 579-84 (Iowa 2013)], and *Ross*, 845 N.W.2d at 698-700.").

In order to succeed on a claim of ineffective assistance of counsel, Gonzalez must establish by a preponderance of the evidence both that his trial counsel failed to perform an essential duty and prejudice resulted. *State v. Morgan*, 877 N.W.2d 133, 136 (Iowa Ct. App. 2016). The claim fails if either prong is not proved. *Id.*

Gonzalez cannot prove prejudice here because the district court could, and did, conclude as a matter of law that there was more than one potential criminal act involved. *See Love*, 858 N.W.2d at 727 n.1 (Mansfield, J., specially concurring) ("I believe in most cases the determination whether more than one potential criminal act was involved could be made as a matter of law. But in a case where it is possible to divide up the conduct into discrete segments in the jury instructions, yet it is debatable whether each segment can be treated as a separate criminal act, and the jury was not instructed to make appropriate findings despite the defendant's request, then a retrial would be necessary."). As observed by the district court, there was sufficient time, distance, and space between the gunshots for a determination as a matter of law that each gunshot was a separate criminal act.

*3. Additional pro se ineffectiveness claim.* One of the ineffective-assistance-of-counsel claims raised in Gonzalez's pro se brief states in part that even if there were two acts, both wounds were fatal and, therefore, the first shot cannot serve as the basis for attempted murder or willful injury because of the

merger doctrine established in *Heemstra*. Gonzalez contends this is supported by the fact that "it was never determined at trial which wound caused the death of Posada." We disagree. We acknowledge the medical examiner first testified that the cause of death was multiple gunshot wounds. But later the medical examiner testified,

> Q. Now, Doctor, let's switch to the gunshot wound to the head. Was that fatal? A. Yes.
> Q. How quickly would that have been fatal? A. That would be certainly more quickly than the gunshot wound to the chest, and could be on the order of minutes.

Clearly, this testimony reflects that the second shot, the shot to the head, is what caused or at least accelerated Posada's death. There was other evidence Posada was still alive after the first gunshot. Under these facts we find no expansion of the felony-murder rule or violation of the merger doctrine announced in *Heemstra* and as further elaborated upon in *Tribble.*

With regard to Gonzalez's contention that he was able to be convicted of felony murder by simply pointing a firearm or displaying a dangerous weapon, we disagree. Our review of the instructions required the State to prove either attempted murder or willful injury. And concerning Gonzalez's other contentions that the jury instructions either were misstatements of the law or not supported by the law or facts, we find them without merit.

***B. Denial of motion for new trial.*** Gonzalez contends the court erred in summarily rejecting his motion for new trial based on his claim that the verdict was against the weight of the evidence. Gonzalez notes that in its order denying his motion, the district court did not specifically state that it had weighed the evidence and made its own credibility determinations. Citing *State v. Maxwell*,

743 N.W.2d 185 (Iowa 2008), Gonzalez acknowledges that the failure of the court to state its reasons for finding the verdict was not contrary to the evidence does not require reversal of an order denying a motion for new trial. However, he requests a change in case law so that the failure to state reasons for a denial of a motion for new trial based upon the weight of the evidence is reversible error and requires remand for reconsideration of a motion for new trial.

First, this court is not at liberty to overrule supreme court precedent. *See State v. Beck*, 854 N.W.2d 56, 64 (Iowa 2014). Moreover, nothing in Iowa Rule of Criminal Procedure 2.24(2)(b) requires the district court to provide its reasons for denying a motion for new trial. In any event, we conclude the trial court did not err in concluding the verdict was not contrary to the weight of the evidence.

***C. Sufficiency of the evidence.*** Finally, Gonzalez asserts there is insufficient evidence that he acted with malice aforethought because he was justified in his actions. The jury was instructed that the State must prove Gonzalez was not justified in using force. There was substantial evidence from which the jury could find several of the factors that would negate the use of force—any one of which was sufficient to reject the justification claim. For instance, the jury could have found Gonzalez "continued the incident which resulted in injury and death" when he followed the shot and bleeding Posada and shot him again in the head at close range, or that "[a]n alternative course of action was available to" Gonzalez. He testified he had knocked the knife from Posada's hand and was running away before he fired the first shot.

**IV. Conclusion.**

We find the two shots fired were sufficiently independent of each other to support a conviction of felony murder and trial counsel was not required to seek an additional jury instruction.  The court did not err in denying Gonzalez's motion for new trial, and there is substantial evidence to support a finding of malice aforethought.  We, therefore, affirm the convictions.

**AFFIRMED.**